78 U.S. 268 (1870)
11 Wall. 268
MILLER
v.
UNITED STATES.
Supreme Court of United States.

*280 Messrs. W.P. Wells and S.T. Douglass, for the plaintiff in error.
Mr. Akerman, Attorney-General, and Mr. Bristow, Solicitor-General, for the United States; Mr. G.F. Edmunds, for the purchasers of the property sold under the decree.
*292 Mr. Justice STRONG delivered the opinion of the court.
This was a proceeding under the acts of Congress of August 6th, 1861, and July 17th, 1862, to confiscate shares of stock in two corporations created by the State of Michigan. The stock had been seized by the marshal of the district, acting indirectly under orders of the President of the United States. The marshal made return to the district attorney that he had seized it, with all dividends, interest, and moneys due thereon, specifying in his return the stock-certificates by which it was represented, and describing the mode of seizure to have been serving a notice thereof personally upon the vice-president of one company, and upon the president of the other. An information was then filed in the District Court, in the nature of a proceeding in rem, against the stock, averring it to be the property of Samuel Miller, of Amherst County, Virgina, a rebel citizen and inhabitant of the United States. The information further averred that the said Miller was one of the persons described in the several clauses of the 5th section of the act of 1862, and also that within the States of Virginia and South Carolina, after the passage of the act, being engaged in armed rebellion against the government of the United States, and being engaged in aiding and abetting such armed rebellion, he did not, within sixty days after the proclamation (mentioned in the 6th section) had been made by the President, cease to *293 aid, countenance, and abet said rebellion, and did not and would not return to his allegiance to the United States. Upon the information thus filed a warrant and monition were issued, commanding the marshal to hold the stocks and property thus described, the same having been by him duly seized, until the further order of the court touching the same, and to give notice, as prescribed, that all persons having any interest in said property, or having anything to say why the same should not be condemned as enemy's property and sold, according to the prayer of the libel, might appear before the court at a time designated therein and make their allegations in that behalf. To this writ or monition the marshal returned as follows: "I hereby certify and return that I have seized and now hold all the property described in the within writ" (the stocks aforesaid), "and now hold the same subject to the future order of said court, and have given notice to all persons interested therein, by publication, as required in the within writ." The record then shows that on the day designated in the monition, after default of all persons had been duly entered, and after reading the depositions which had been taken on behalf of the United States, the shares of stock were condemned as forfeited and a writ of venditioni exponas was ordered, under which they were sold. After this Miller applied by petition to the District Court, praying that the decree of condemnation might be opened and set aside, but the prayer of the petition was denied. The case was then removed to the Circuit Court by writ of error, and the decree having been affirmed, the record has been brought into this court for review.
We notice at the outset an objection urged against the competency of the plaintiff in error to sue out the writ which-brings the case here, on the ground that he was not a claimant in the District Court, only to say that it is set at rest by the decision made in Mc Veigh v. United States, a case decided at this term.[*]
Assuming, then, that the case is properly in this court, *294 and that the plaintiff in error has a right to be heard, we proceed to notice the errors assigned.
The first is, that there was no such seizure of the stocks as gave the court jurisdiction to condemn them as forfeited, and to order their sale.
This was a fatal error, if the fact was as claimed. In revenue and admiralty cases a seizure is undoubtedly necessary to confer, upon the court jurisdiction over the thing when the proceeding is in rem. In most such cases the res is movable personal property, capable of actual manucaption. Unless taken into actual possession by an officer of the court, it might be eloigned before a decree of condemnation could be made, and thus the decree would be ineffectual. It might come into the possession of another court, and thus there might arise a conflict of jurisdiction and decision, if actual seizure and retention of possession were not necessary to confer jurisdiction over the subject. But how can it be maintained there was up sufficient seizure in this case? The record shows one. The marshal returned to the warrant that he had seized the property, and that he then held it subject to the further order of the court. Why is not this conclusive? Can a sheriff's or marshal's return to a writ be contradicted by a plaintiff in error? It is true the return did not describe the mode of seizure, but neither the writ nor the law required that more than the fact should be stated. The return met all the exigencies of the writ. It cannot be presumed, in the face of the record, that an illegal seizure was made, or that some act was done that did not amount to a seizure. But it is said the warrant with monition did not require the marshal to seize; that it only commanded him to hold the stock, the same having been by him duly seized, until the further order of the court. Whether this was not an order to seize, as well as to hold after seizure, we need not determine. Confessedly the object of the writ was to bring the property under the control of the court and keep it there, as well as to give notice to the world. These objects would have been fully accomplished if its direction had been nothing more than to hold the property subject to *295 the order of the court, and to give notice. The marshal had already seized the stock, and it remained in his possession. An order to seize property already in his hands would have been superfluous. All that was needed was that, having the property, he should hold it subject to the order of the court Thus held by its officer, the jurisdiction was complete. But the writ was larger. It commanded him to hold the property, it having been duly seized; and he returned a seizure. The act of Congress does not require that proceedings in confiscation shall conform precisely to those in admiralty or revenue cases, but only "as near as may be." They must be adapted to the peculiarities of the case, following proceedings in admiralty and revenue so nearly as may be, consistently with the objects Congress had in view. Yet even in admiralty it cannot be doubted, if a warrant with a monition should command a marshal to hold goods already in his possession until the further order of the court touching the same, and he should return that he had seized them, and that he held them as required, the jurisdiction of the court over them would be complete. To hold otherwise would be to sacrifice the spirit to the letter of form, the substance to the shadow.
It is insisted, however, that inasmuch as the return to the warrant is silent respecting the mode of seizure, we may look to the seizure made by the marshal under the executive order before the information was filed. That was made by direction of the district attorney, acting under authority of the President, and the marshal, in reporting his action, returned that he seized the stock "by serving a notice of said seizure personally upon the vice-president of one company, and upon the president of the other." It is assumed that the judicial seizure made under the judicial warrant was made in the same way, or that it was the same seizure, and it is argued that the action of the marshal did not amount to a seizure effectual to bring the property within the jurisdiction of the court. The first observation we have to make in regard to this is, that the plaintiff in error has no right to make any such assumption. It is justified by *296 nothing in the record. True, a seizure under order of the President was necessary to warrant the institution of judicial proceedings for confiscation, and it may be, therefore, a proper inquiry whether what the marshal did under the executive order amounted to such a seizure. But the marshal's return to the judicial warrant, and his report to the district attorney, speak of distinct transactions, occurring at different times and under different directions. Waiving this, however, and assuming that the manner of seizure spoken of in the return to the warrant and monition was the same as that described in the report to the district attorney, we are of opinion the seizure was good and effective, sufficient to give the court jurisdiction over the property.
The act of Congress of July 17, 1862, made it the duty of the President to cause the seizure of all the estate, property, money, stocks, credits, and effects of the persons described, and in order to secure the condemnation and sale of such property, after its seizure, directed judicial proceedings, in rem, to be instituted. It contemplated that every kind of property mentioned could be seized effectually in some mode. It had in view not only tangible property, but that which is in action. It named stocks and credits; but it gave no directions respecting the mode of seizure. It is, therefore, a fair conclusion that the mode was intended to be such as is adapted to the nature of the property directed to be seized, and in use in courts of revenue and admiralty. The modes of seizure must vary. Lands cannot be seized as movable chattels may. Actual manucaption cannot be taken of stocks and credits. But it does not follow from this that they are incapable of being seized, within the meaning of the act of Congress. Seizure may be either actual or constructive. It does not always involve taking into manual possession. Even in case of chattels movable, taking part of the goods in a house, under a fi. fa., in the name of the whole, is a good seizure of all.[*] An assertion of control, with a present power and intent to exercise it, is sufficient. *297 We are told there is no statute in Michigan that authorizes the service of mesne process upon a corporation for the attachment of its stock. Be it so. That does not show that stocks cannot be seized or attached when Congress orders a seizure. Federal officers and Federal courts are not dependent upon State legislation for power to lay hold of property. Can it be that the government may seize credits and corporation stocks of public enemies in those States where provision is made by State legislation for modes of seizure of such property, but may not seize similar property of the same enemies in other States where there are no such statutes? There is, however, such a thing as seizure of corporation stocks in Michigan on final process, effected by service of a copy of the writ on an officer of the corporation, and similar modes of seizure are in use in most, if not in all, the States. Garnishment almost everywhere exists. What is that but substantial attachment? It arrests the property in the hands of the garnishee, interferes with the owner's or creditor's control over it, subjects it to the judgment of the court, and therefore has the effect of a seizure. In all cases where the garnishee is a debtor, or where the garnishment is of stocks, it is effected by serving notice upon the debtor, or corporation. A corporation holds its stock, as a quasi trustee, for its stockholders. The service of an attachment, though it is but a notice, binds the debt or the stock in the hands of the garnishee, from the time of the service, and thenceforward it is potentially in "gremio legis." The statute declares that proceedings to confiscate shall conform, as nearly as may be, to proceedings in admiralty or revenue cases. Now, it is legitimate in certain proceedings in courts of admiralty to attach credits and effects of such an intangible nature that they cannot be taken into actual possession by the marshal, and the mode of attachment is by notice, dependent upon no statutory enactment. See Manro v. Almeida.[*] In that case, reference was made approvingly to Clerke's Praxis,[] where it appears that it is consistent with *298 the practice of the admiralty, in cases where there is no property which the officer can attach by manucaption, to attach goods or credits in the hands of third persons, by means of the simple service of a notice. The language of this court was, that, "as goods and credits, in the hands of a third person, wherever situated, may be attached by notice, there cannot be a reason assigned why the goods themselves, if accessible, should not be actually attached, and although it is very clear that the process of attaching by notice seems given as the alternative when the officer cannot have access to the goods themselves, yet all this may be confided to the discretion of the judge who orders the process."[*] These are, indeed proceedings to compel appearance, but they are, nevertheless, attachments or seizures, bringing the subject seized within the control of the court, and, what is of primary importance, they show that, in admiralty practice, rights in action, things intangible, as stocks and credits, are attached by notice to the debtor, or holder, without the aid of any statute.
It was in this mode, known to the courts, and dependent on no statute, that the marshal seized the stock of the plaintiff in error. It is impossible for us to hold that his act was no sufficient seizure.
A single observation more upon this part of the case. The eighth and the fourteenth sections of the act of 1862 empowered the courts to make orders and decrees, to issue process, and do all other things necessary to fitly and efficiently carry out the purposes of the act, which were to seize and confiscate (inter alia) stocks and credits. Under this authority the court might have made an order, had it been necessary, prescribing as the mode of seizure precisely what the marshal did. And, if so, it would be difficult to maintain that, in proceeding to adjudicate upon the stocks, there was not a recognition of the marshal's action, as a valid seizure, equivalent to an antecedent order thus to seize. The decree expressly declared that the stocks had been seized.
*299 The second assignment of error is, that there was no such hearing and proof in the case as was necessary to a valid decree of condemnation. Whether this assignment is well made must be determined by the record. That shows an information containing averments of all facts necessary to warrant a decree of condemnation. It shows a warrant and monition, return of seizure and publication of notice, and a decree setting forth that the warrant of confiscation and monition having been duly made, and the default of all persons having been duly entered, it was thereupon, on motion of the district attorney, and on reading and filing the depositions taken on behalf of the United States, ordered, sentenced, and decreed by the court that the shares of stock standing in the name of Samuel Miller on the books of the companies, and belonging to him, which had been before seized by the marshal in this proceeding, be condemned as forfeited to the United States. Thus it appears a default was duly entered to a monition, founded on an information averring all necessary facts; that the decree was entered on motion, after default, and after reading depositions taken on behalf of the United States.
But it is insisted the District Court did not find that the stocks belonged to a person engaged in the rebellion, or who had given aid or comfort thereto, which, it is said, are made necessary findings by the seventh section of the act, before a decree of condemnation can be entered.
This is not an objection to the jurisdiction of the court. We have already shown that was complete. It is an objection to the regularity of proceeding, and it assumes that the record must show affirmatively there was no irregularity. It presumes, therefore, against the record. The general rule, however, is, that in courts of record all things are presumed to have been rightly done.[*] In courts of limited jurisdiction, indeed, there is a presumption against jurisdiction, but when that appears they are entitled to the same presumptions in favor of their action as other courts are. *300 The district and circuit courts are of limited jurisdiction, but they are not inferior courts, and they are therefore entitled to the same presumptions in their favor. Those presumptions are that the court, having jurisdiction, and having entered a judgment, did everything that was necessary to warrant its entry of the judgment. Undoubtedly the contrary may be shown in a court of error, but the burden of showing it is upon him who alleges error. The legal intendment is against him. This doctrine is abundantly sustained by the authorities. Thus, in Railroad Company v. Stimpson,[*] which was a patent case, Judge Story said, "It is a presumption of law that all public officers perform their official duties until the contrary is proved. And when," said he, "an act is to be done, or patent granted, upon evidence and proofs to be laid before a public officer, upon which he is to decide, the fact that he has done the act, or granted the patent, is primâ facie evidence that the proofs have been regularly made and were satisfactory. It is not then necessary for the patent to contain any recitals that the prerequisites to the grant of it have been duly complied with, for the law makes the presumption." And in Grignon's Lessee v. Astor,[] which related to a proceeding in rem, and where the order of sale did not set out the facts which, under the law, must have existed before a sale could be decreed, Mr. Justice Baldwin said, "The record of the county court shows that there was a petition representing some facts by the administrator, who prayed an order of sale; that the court took those facts which were alleged in the petition into consideration, and for these and divers other good reasons, ordered that he be empowered to sell. It did then appear to the court that there were facts and reasons before them that brought their power into action, and that it was exercised by granting the prayer of the petitioner, and the decree of the court does not specify the facts and reasons, or refer to the evidence on which they were made to appear to the judicial eye; they must have been, and the law presumes *301 that they were, such as to justify this action." So in Erwin v. Lowry,[*] Mr. Justice Catron, in delivering the judgment of the court, said, "We hold that wherever a judgment is given by a court having jurisdiction of the parties, and of the subject-matter, the exercise of jurisdiction warrants the presumption, in favor of a purchaser, that the facts, which were necessary to be proved to confer jurisdiction, were found."
It is not, however, necessary to invoke the maxim, "omnia presumunter rite acta esse," in support of this record. It appears, affirmatively, that all the facts were found or established which, under the act of Congress, were essential to justify the judgment. It has been observed the information set out that the stocks belonged to Samuel Miller, and that he was a person engaged in the rebellion, who had given aid or comfort thereto; that monition was duly made, and that there was default of all persons to appear and claim or show cause why the property should not be condemned as enemy's property. The default appears to have been duly entered. Were this, then, a proceeding according to the forms of a common law action, the facts averred by the information would be considered as established or confessed, and everything found necessary for a judgment. The effect of a default to appear in an admiralty or a revenue proceeding is ordinarily the same as in other actions at law. It is a virtual confession. In Benedict's Admiralty,[] the practice in proceedings in rem is stated to be, if no one appears in response to the proclamation for all persons having anything to say why the property should not be condemned to come forward and make their allegations in that behalf, that, on motion of the libellant's proctor, the defaults are entered, and a decree of condemnation and sale is made on a brief statement by the proctor of the cause of action. When the libellant's claim may not cover the whole value of the property, there is a subsequent hearing to ascertain the amount to which the libellant is entitled, but the decree of condemnation and sale is entered on the default alone. So the same *302 author says,[*] "In cases of seizure, when no one appears, the decree of condemnation is absolute, the only question being whether the property be forfeited or not. In such cases it is usual for the district attorney, on his motion for condemnation, to state briefly the substance of the libel and the cause of forfeiture." In United States v. The Schooner Lion,[] Judge Sprague admitted that in some cases condemnation followed default of necessity without a hearing, though, in the case then before him, he held that some hearing was necessary, because the act of Congress under which the forfeiture was then sought (that of fishing vessels for violations of law in obtaining fishing bounties) provided that after default the court should proceed to hear and determine the cause according to law. The act under which these proceedings have been taken makes no such requisition; and even in United States v. Lion, Judge Sprague said, to what extent there must be a hearing must depend upon the circumstances of the case. The court, said he, will at least examine the allegations of the libel to see if they are sufficient in law, and the return of the marshal, and such affidavit or affidavits as the district attorney shall submit. He added that a wilful omission by the owners to answer might of itself satisfy the court that a forfeiture should be decreed. This, in a case where the statute required a hearing after default. In the present case, though governed by no such requirement, the court did examine the depositions, and then, on motion of the district attorney, condemned the property. We have said the acts of 1861 and 1862 do not require any hearing after a default has been duly entered, as did the acts relative to forfeitures for violations of law respecting fishing bounties. It has been suggested, however, the act of 1789 directs that, in admiralty proceedings, there shall be a hearing after default. But there is no warrant for the suggestion. The act of 1789 contains no such provision. Neither the 19th section, nor any other part of the act, can be construed as making any such requirement. No change is made in the usual course of admiralty proceedings.
*303 There is no essential difference between the forms of proceeding or the practice in revenue cases and those in adm ralty, except where there are disputed facts. The form are described in Manning's Exchequer Practice.[*] There appears that, though generally there is one proclamation to call in claimants, then an appraisement, and a second proclamation inviting bidders for more than the appraisement, many condemnations appear in the old records upon a single proclamation. Default to the first is a default of claimants; default to the second is a default of bidders.[] Throughout the chapter condemnation by default is treated as in accordance with the practice of the courts in such cases. In Attorney-General v. Lade,[] may be found an entire record of a revenue proceeding in rem to forfeit gold and silver coin seized for attempted exportation out of the realm contrary to acts of Parliament. The record, after reciting the information, seizure, &c., proceeds as follows: "Whereupon, proclamation being made for his said Majesty, as the custom is, that if any one would inform the court here why the said several pieces of gold and silver coin of this realm, and also the said several pieces of foreign gold coin, should not, for the reasons aforesaid, remain forfeited, he might come and he should be heard, and no one appearing to do this, it is adjudged by the barons here that the said several pieces of gold and silver coin of this realm, and also the said several pieces of foreign gold coin, do, for the reasons aforesaid, remain forfeited." This judgment, on review, was held to be regular, after the court had ordered precedents to be searched. It thus appears that in revenue cases, as in admiralty, default entered establishes the facts averred in the libel or information as effectively as they can be established on hearing, and warrants a decree of condemnation if the information contains the necessary averments. The second assignment of error cannot, therefore, be sustained.
The third assignment is, that as the proceedings related *304 to seizure on land the case was one of common law jurisdiction, and there should have been a trial by jury; and we are referred to Union Insurance Company v. United States,[*] Armstrong's Foundry,[] and other kindred cases. But in this cause there was a default. After the default there was no fact to be ascertained. The province of a jury in suits at common law is to decide issues of fact. When there are no such issues there can be nothing for a jury to try. This assignment is, therefore, without merit. None of the cases cited go further than to hold that issues of fact, on the demand of either party, must be tried by jury.
It remains to consider the objection urged on behalf of the plaintiff in error that the acts of Congress under which these proceedings to confiscate the stock have been taken are not warranted by the Constitution, and that they are in conflict with some of its provisions. The objection starts with the assumption that the purpose of the acts was to punish offences against the sovereignty of the United States, and that they are merely statutes against crimes. If this were a correct assumption, if the act of 1861, and the fifth, sixth, and seventh sections of the act of July 17, 1862, were municipal regulations only, there would be force in the objection that Congress has disregarded the restrictions of the fifth and sixth amendments of the Constitution. Those restrictions, so far as material to the argument, are, that no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury; that no person shall be deprived of his property without due process of law, and that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed. But if the assumption of the plaintiff in error is not well made, if the statutes were not enacted under the municipal power of Congress to legislate for the punishment of crimes against the sovereignty of the United States, if, on the contrary, they are an exercise of *305 the war powers of the government, it is clear they are not affected by the restrictions imposed by the fifth and sixth amendments. This we understand to have been conceded in the argument. The question, therefore, is, whether the action of Congress was a legitimate exercise of the war power. The Constitution confers upon Congress expressly power to declare war, grant letters of marque and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted. It therefore includes the right to seize and confiscate all property of an enemy and to dispose of it at the will of the captor. This is and always has been an undoubted belligerent right. If there were any uncertainty respecting the existence of such a right it would be set at rest by the express grant of power to make rules respecting captures on land and water. It is argued that though there are no express constitutional restrictions upon the power of Congress to declare and prosecute war, or to make rules respecting captures on land and water, there are restrictions implied in the nature of the powers themselves. Hence it is said the power to prosecute war is only a power to prosecute it according to the law of nations, and a power to make rules respecting captures is a power to make such rules only as are within the laws of nations. Whether this is so or not we do not care to inquire, for it is not necessary to the present case. It is sufficient that the right to confiscate the property of all public enemies is a conceded right. Now, what is that right, and why is it allowed? It may be remarked that it has no reference whatever to the personal guilt of the owner of confiscated property, and the act of confiscation is not a proceeding against him. The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to *306 appropriate the property.[*] In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy's country, no matter what his nationality. The whole doctrine of confiscation is built upon the foundation that it is an instrument of coercion, which, by depriving an enemy of property within reach of his power, whether within his territory or without it, impairs his ability to resist the confiscating government, while at the same time it furnishes to that government means for carrying on the war. Hence any property which the enemy can use, either by actual appropriation or by the exercise of control over its owner, or which the adherents of the enemy have the power of devoting to the enemy's use, is a proper subject of confiscation.
It is also to be observed that when the acts of 1861 and 1862 were passed, there was a state of war existing between the United States and the rebellious portions of the country. Whether its beginning was on the 27th or the 30th of April, 1861, or whether it was not until the act of Congress of July 13th of that year, is unimportant to this case, for both acts were passed after the existence of war was alike an actual and a recognized fact.[] War existing, the United States were invested with belligerent rights in addition to the sovereign powers previously held. Congress had then full power to provide for the seizure and confiscation of any property which the enemy or adherents of the enemy could use for the purpose of maintaining the war against the government. It is true the war was not between two independent nations. But because a civil war, the government was not shorn of any of those rights that belong to belligerency. Mr. Wheaton, in his work on international law,[] asserts the doctrine to be that "the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other, and even as it respects neutral nations." It would be absurd to hold that, *307 while in a foreign war enemy's property may be captured and confiscated as a means of bringing the struggle to a successful completion, in a civil war of equal dimensions, requiring quite as urgently the employment of all means to weaken the belligerent in arms against the government, the right to confiscate the property that may strengthen such belligerent does not exist. There is no such distinction to be made. Every reason for the allowance of a right to confiscate in case of foreign wars exists in full force when the war is domestic or civil. It is, however, unnecessary to pursue this branch of the subject farther. In the Amy Warwick,[*] and in the Prize Cases,[] it was decided that in the war of the rebellion the United States sustained the double character of a belligerent and a sovereign, and had the rights of both.[]
We come, then, directly to the question whether the act of 1861, and the fifth, sixth, and seventh sections of the act of 1862 were an exercise of this war power, the power of confiscation, or whether they must be regarded as mere municipal regulations for the punishment of crime. The answer to this question must be found in the nature of the statutes and of the proceedings directed under them. In the case of Rose v. Himely,[§] Chief Justice Marshall, in delivering the opinion of the court, said: "But admitting a sovereign, who is endeavoring to reduce his revolted subjects to obedience, to possess both sovereign and belligerent rights, and to be capable of acting in either character, the manner in which he acts must determine the character of the act. If, as a legislator, he publishes a law ordaining punishment for certain offences, which law is to be applied by courts, the nature of the law and of the proceedings under it will decide whether it is an exercise of belligerent rights or exclusively of his sovereign power; and whether *308 the court, in applying this law to particular cases, acts as a prize court or as a court enforcing municipal regulations."
Apply this test to the present case.
It is hardly contended that the act of 1861 was enacted in virtue of the sovereign rights of the government. It defined no crime. It imposed no penalty. It declared nothing unlawful. It was aimed exclusively at the seizure and confiscation of property used, or intended to be used; to aid, abet, or promote the rebellion, then a war, or to maintain the war against the government. It treated the property as the guilty subject. It cannot be maintained that there is no power to seize property actually employed in furthering a war against the government, or intended to be thus employed. It is the act of 1862, the constitutionality of which has been principally assailed. That act had several purposes, as indicated in its title. As described, it was "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." The first four sections provided for the punishment of treason, inciting or engaging in rebellion or insurrection, or giving aid and comfort thereto. They are aimed at individual offenders, and they were undoubtedly an exercise of the sovereign, not the belligerent rights of the government. But when we come to the fifth and the following sections we find another purpose avowed, not punishing treason and rebellion, as described in the title, but that other purpose, described in the title, as "seizing and confiscating the property of rebels." The language is, "that to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States." Then follows a description of six classes of persons, those referred to as the persons whose property should be liable to seizure. The sixth section describes still another class. Now, the avowed purpose of all this was, not to *309 reach any criminal personally, but "to insure the speedy termination of the rebellion" then present, which was a war, which Congress had recognized as a war, and which this court has decided was then a war. The purpose avowed then was legitimate, such as Congress, in the situation of the country, might constitutionally entertain, and the provisions made to carry out the purpose, viz., confiscation, were legitimate, unless applied to others than enemies. It is argued, however, that the enactments were for the confiscation of property of rebels, designated as such, and that the law of nations allows confiscation only of enemy's property. But the argument overlooks the fact that the rebellion then existing was a war. And, if so, those engaged in it were public enemies. The statute referred exclusively to the rebellion then in progress. Whatever may be true in regard to a rebellion which does not rise to the magnitude of a war, it must be that when it has become a recognized war those who are engaged in it are to be regarded as enemies. And they are not the less such because they are also rebels. They are equally well designated as rebels or enemies. Regarded as descriptio personarum, the words "rebels" and "enemies," in such a state of things, are synonymous. And, if this is true, it is evident the statute, in denominating the war rebellion, and the persons whose property it attempts to confiscate rebels, may, at least, have intended to speak of a war and of public enemies. Were this all that could be said it would be enough, for when a statute will bear two constructions, one of which would be within the constitutional power of Congress to enforce, and the other a transgression of the power, that must be adopted which is consistent with the Constitution. It is always a presumption that the legislature acts within the scope of its authority. But there is much more in this case. It is impossible to read the entire act without observing a clear distinction between the first four sections, which look to the punishment of individual crime, and which were, therefore, enacted in virtue of the sovereign power, and the subsequent sections, which have in view a state of public war, and which direct *310 the seizure of the property of those who were in fact enemies, for the support of the armies of the country. The ninth, tenth, and eleventh sections are in this view significant. They declared that all slaves of persons engaged in rebellion against the government of the United States, or who should in any way give aid and comfort thereto, escaping within our lines, or captured from such persons, or deserted by them, should be deemed captives of war, and forever free; that escaping slaves of such owners should not be delivered up, and that no person engaged in the military or naval service should, under any pretence whatever, surrender slaves to claimants. The act then goes on to provide for the employment of persons of African descent in the suppression of the rebellion. Can it be that all this was municipal legislation, that it had no reference to the war power of the government, that it was not an attempt to enforce belligerent rights? We do not think so. We are not to strain the construction of an act of Congress in order to hold it unconstitutional.
It has been argued, however, that the provisions of the act for confiscation are not confined in their operation to the property of enemies, but that they are applicable to the property of persons not enemies within the laws of nations. If by this is meant that they direct the seizure and confiscation of property not confiscable under the laws of war, we cannot yield to it our assent. It may be conceded that the laws of war do not justify the seizure and confiscation of any private property except that of enemies. But who are to be regarded as enemies in a domestic or civil war? In case of a foreign war all who are inhabitants of the enemy's country, with rare exceptions, are enemies whose property is subject to confiscation; and it seems to have been taken for granted in this case that only those who during the war were inhabitants of the Confederate States were liable to have their property confiscated. Such a proposition cannot be maintained. It is not true even in case of a foreign war. It is ever a presumption that inhabitants of an enemy's territory are enemies, even though they are not participants in *311 the war, though they are subjects of neutral states, or even subjects or citizens of the government prosecuting the war against the state within which they reside. But even in foreign wars persons may be enemies who are not inhabitants of the enemy's territory. The laws of nations nowhere declare the contrary. And it would be strange if they did, for those not inhabitants of a foreign state may be more potent and dangerous foes than if they were actually residents of that state. By uniting themselves to the cause of a foreign enemy they cast in their lot with his, and they cannot be permitted to claim exemptions which the subjects of the enemy do not possess. Depriving them of their property is a blow against the hostile power quite as effective, and tending quite as directly to weaken the belligerent with whom they act, as would be confiscating the property of a non-combatant resident. Clearly, therefore, those must be considered as public enemies, and amenable to the laws of war as such, who, though subjects of a state in amity with the United States, are in the service of a state at war with them, and this not because they are inhabitants of such a state, but because of their hostile acts in the war. Even under municipal law this doctrine is recognized. Thus in Vaughan's Case,[*] Lord Holt laid down the doctrines, "If the States (Dutch) be in alliance, and the French at war with us, and certain Dutchmen turn rebels to the States, and fight under the command of the French king, they are enemies to us, for the French subjection makes them French subjects in respect of all nations but their own." So, "if an Englishman assist the French, and fight against the king of Spain, our ally, this is an adherence to the king's enemies."
Still less is it true that the laws of nations have defined who, in the case of a civil war, are to be regarded and may be treated as enemies. Clearly, however, those must be considered such who, though subjects or citizens of the lawful government, are residents of the territory under the *312 power or control of the party resisting that government. Thus much may be gathered from the Prize Cases. And why are not all who act with that party? Have they not voluntarily subjected themselves to that party; identified themselves with it? And is it not as important to take from them the sinews of war, their property, as it is to confiscate the property of rebel enemies resident within the rebel territory? It is hard to conceive of any reason for confiscating the property of one class that does not equally justify confiscating the property of the other. We have already said that no recognized usage of nations excludes from the category of enemies those who act with, or aid or abet and give comfort to enemies, whether foreign or domestic, though they may not be residents of enemy's territory. It is not without weight, that when the Constitution was formed its framers had fresh in view what had been done during the Revolutionary war. Similar statutes for the confiscation of property of domestic enemies, of those who adhered to the British government, though not residents of Great Britain, were enacted in many of the States, and they have been judicially determined to have been justified by the laws of war. They show what was then understood to be confiscable property, and who were public enemies. At least they show the general understanding that aiders and abettors of the public enemy were themselves enemies, and hence that their property might lawfully be confiscated. It was with these facts fresh in memory, and with a full knowledge that such legislation had been common, almost universal, that the Constitution was adopted. It did prohibit ex post facto laws. It did prohibit bills of attainder. They had also been passed by the States. But it imposed no restriction upon the power to prosecute war or confiscate enemy's property. It seems to be a fair inference from the omission that it was intended the government should have the power of carrying on war as it had been carried on during the Revolution, and therefore should have the right to confiscate as enemy's property, not only the property of foreign enemies, but also that of domestic, and of the aiders, *313 abetters, and comforters of a public enemy. The framers of the Constitution guarded against excesses that had existed during the Revolutionary struggle. It is incredible that if such confiscations had not been contemplated as possible and legitimate, they would not have been expressly prohibited, or at least restricted. We are therefore of opinion, that neither the act of 1861 nor that of 1862 is invalid, because other property than that of public enemies is directed to be confiscated. We do not understand the acts, or either of them, to be applicable to any other than the property of enemies. All the classes of persons described in the fifth and sixth sections of the act of 1862 were enemies within the laws and usages of war.
It is further objected on behalf of the plaintiff in error, that under the statute of 1862 the property of all enemies was not made liable to confiscation. From this it is inferred, that whether persons were within the law or not depended not on their being enemies, but on certain overt criminal acts described and defined by the law. The fact asserted, namely, that all enemies were not within the purview of the enactment we may admit, but we dissent from the inference. Plainly, it was competent for Congress to determine how far it would exert belligerent rights, and it is quite too large a deduction from the fact that the property only of certain classes of enemies was directed to be confiscated, that it was not intended to confiscate the property of enemies at all. If it be true that all the persons described in the fifth, sixth, and seventh sections were enemies, as we have endeavored to show they were, it cannot matter by what name they were called, or how they were described. The express declaration of the seventh section was that their property should be condemned "as enemies' property," and become the property of the United States, to be disposed of as the court should decree, the proceeds being paid into the treasury for the purposes described, to wit, the support of the army. It was, therefore, as enemies' property, and not as that of offenders against municipal law, that the statute directed its confiscation.
Upon the whole, then, we are of opinion the confiscation *314 acts are not unconstitutional, and we discover no error in the proceedings in this case.
DECREE AFFIRMED.
Mr. Justice FIELD, with whom concurred Mr. Justice CLIFFORD, dissenting.
I am unable to agree with the majority of the court in the judgment just rendered in this case, and will state, with as much brevity as possible, the grounds of my disagreement.
The case was brought for the forfeiture of personal property belonging to the appellant, and is founded upon what is termed the Confiscation Act of July 17th, 1862. There is, it is true, a count in the libel upon the act of August 6th, 1861, but no reliance has been placed upon it to support the forfeiture. The case has proceeded upon the theory that the stock, alleged to have been seized by the marshal, was in Michigan, and had been there since it was issued, a period anterior to the rebellion, and, of course, to the passage of the act in question, a position inconsistent with any claim that the property had been subsequently purchased to be used, or had been used, in aiding, abetting, or promoting the rebellion. No further attention will therefore be given to that act.
I shall direct my attention, in the first place, to the validity of the legislation embodied in the act of July 17th, 1862, and then assuming that legislation to be valid and in accordance with the Constitution, shall consider whether the proceedings in the case are in conformity with its requirements.
The authority for the legislation in question must be found in what are termed the war powers of the government; which, so far as they touch upon the present subjects of inquiry, are the power to declare war, to suppress insurrection, and to make rules concerning captures on land and water; or, in what is termed the municipal power of the government to legislate for the punishment of offences against the United States.
It has been held, that when the late rebellion assumed the proportions of a territorial civil war, the inhabitants of the *315 Confederate States, and the inhabitants of the loyal States, became reciprocally enemies to each other, and that the inhabitants of the Confederate States engaged in the rebellion, or giving aid and comfort thereto, were at the same time amenable to the municipal law as rebels. The correctness of this determination is not disputed. The question is, not as to the right of the United States to adopt either course against the inhabitants of the Confederate States engaged in the rebellion; that is, the right to treat them as public enemies, and to apply to them all the harsh measures justified by the rules of war; or the right to prosecute them in the ordinary modes of criminal procedure for the punishment of treason; but what course has Congress, by its legislation, authorized. For it is evident that legislation founded upon the war powers of the government, and directed against the public enemies of the United States, is subject to different considerations and limitations from those applicable to legislation founded upon the municipal power of the government and directed against criminals. Legislation in the former case is subject to no limitations, except such as are imposed by the law of nations in the conduct of war. Legislation in the latter case is subject to all the limitations prescribed by the Constitution for the protection of the citizen against hasty and indiscriminate accusation, and which insure to him, when accused, a speedy and public trial by a jury of his peers.
The war powers of the government have no express limitation in the Constitution, and the only limitation to which their exercise is subject is the law of nations. That limitation necessarily exists. When the United States became an independent nation, they became, to use the language of Chancellor Kent, "subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law."[*] And it is in the light of that law that the war powers of the government must be considered. The power to prosecute war *316 granted by the Constitution, as is well said by counsel, is a power to prosecute war according to the law of nations, and not in violation of that law. The power to make rules concerning captures on land and water is a power to make such rules as Congress may prescribe, subject to the condition that they are within the law of nations. There is a limit to the means of destruction which government, in the prosecution of war, may use, and there is a limit to the subjects of capture and confiscation, which government may authorize, imposed by the law of nations, and is no less binding upon Congress than if the limitation were written in the Constitution.[*] The plain reason of this is, that the rules and limitations prescribed by that law were in the contemplation of the parties who framed and the people who adopted the Constitution.
Whatever any independent civilized nation may do in the prosecution of war, according to the law of nations, Congress, under the Constitution, may authorize to be done, and nothing more.
Now, in Brown v. United States,[] Mr. Chief Justice Marshall, in delivering the opinion of the court, said that it was conceded that "war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found," and added that "the mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains *317 undiminished, and when the sovereign authority shall choose to bring it into operation the judicial department must give effect to its will." The question presented for consideration in that case was whether enemy's property, found on land at the commencement of hostilities with Great Britain in 1812, could be seized and condemned as a necessary consequence of the declaration of war; and the decision of the court was that it could not be condemned without an act of Congress authorizing its confiscation. The language of the eminent chief justice is perhaps subject to some qualification, if it was intended to state as a rule of public law that all property of the enemy, whether on land or water, was subject to confiscation. Mr. Wheaton, who is authority on all questions of public law, says that by the modern usage of nations, which has acquired the force of law, "private property on land is exempt from confiscation, with the exception of such as may become booty in special cases, when taken from enemies in the field or in besieged towns, and of military contributions levied upon the inhabitants of the hostile territory," and that "this exemption extends even to the case of an absolute and unqualified conquest of the enemy's country."[*] And Mr. Chief Justice Marshall, in the subsequent case of The United States v. Percheman,[] observed that it was unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country, and that "the modern usage of nations, which has become law, would be violated; that sense of justice and right, which is acknowledged and felt by the whole civilized world, would be outraged if private property should be generally confiscated, and private rights annulled."
But assuming the severe rule laid down by the chief justice to be the true rule, it applies only to the property of enemies, and by enemies is meant permanent inhabitants of the enemy's country. It is their property alone which is the subject of seizure and confiscation by authority of Congress, legislating under the war powers. Their property is *318 liable, not by reason of any hostile disposition manifested by them or hostile acts committed, or any violations of the laws of the United States, but solely from the fact that they are inhabitants of the hostile country, and thus in law are enemies.
If we turn now to the act of July 17th, 1862, we find that its provisions are not directed against enemies at all, but against persons who have committed certain overt acts of treason. It does not purport in any part of it to deal with enemies. It declares in its title that its object is "to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." The other purposes relate principally to slaves, their employment or colonization, and the power of the President to proclaim amnesty and pardon. They have no bearing upon the questions under consideration, and need not be further noticed. The first section of the act prescribes the punishment for treason thereafter committed. It punishes it with death, or, in the discretion of the court, with imprisonment for not less than five years and a fine of not less than ten thousand dollars; and it provides that the slaves of the party adjudged guilty, if any he have, shall be declared free. The second section provides for the punishment of the offence of inciting, setting on foot, or engaging in any rebellion or insurrection against the authority of the United States or the laws thereof, or engaging in or giving aid and comfort to the rebellion then existing. The third section declares that parties guilty of either of the offences thus described shall be forever incapable and disqualified to hold any office under the United States. The fourth section provides that the act shall not affect the prosecution, conviction, or punishment of persons guilty of treason before the passage of the act, unless such persons are convicted under the act itself.
Then follow the clauses which provide for the seizure and confiscation of the property of certain classes of persons, who may thereafter be guilty of certain overt acts of treason. They contain no directions whatever for the seizure of the property *319 of enemies, but only of persons who may thereafter violate the provisions of the act. Among the classes designated are included persons who may thereafter hold any agency under the Confederate States or under any State composing the Confederacy, and persons owning property in any loyal State or Territory of the United States or District of Columbia, who shall thereafter assist and give aid and comfort to the rebellion; persons who may or may not be enemies in the sense in which the term is used in the law of nations; that is, permanent inhabitants of the enemy's country. So through all the provisions of the act, there is not a single clause which indicates, in the slightest degree, that it was against public enemies its provisions were directed. They are applicable to all persons who may do certain acts, whether they be enemies or not within the meaning of the law of nations.
The only place in the act where the word enemies is used, is in the clause which provides that if it be found by the courts, before which proceedings are instituted, that the property seized belonged to a person engaged in the rebellion or who had given aid or comfort thereto, it should be condemned as enemies' property; that is, should be condemned in the same manner as if it were enemies' property. This clause does not provide that the property shall be condemned if found to be enemies' property, but that when condemned it shall be with the like effect as though it were such property.
It would seem clear, therefore, that the provisions of the act were not passed in the exercise of the war powers of the government, but in the exercise of the municipal power of the government to legislate for the punishment of offences against the United States. It is the property of persons guilty of certain acts, wherever they may reside, in loyal or disloyal States, which the statute directs to be seized and confiscated. It is also for acts committed after the passage of the statute, except in one particular, corrected by the joint resolution of the two houses, that the forfeiture is to be declared. If it had been the intention of the statute to confiscate *320 the property of enemies, its prospective character would have been entirely unnecessary, for whenever public war exists the right to order the confiscation of enemies' property, according to Mr. Chief Justice Marshall, exists with Congress.
That the legislation in question was directed, not against enemies, but against persons who might be guilty of certain designated public offences, and that the forfeiture ordered was intended as a punishment for the offences, is made further evident by what followed the passage of the act of Congress. After the bill was sent to the President it was ascertained that he was of opinion that it was unconstitutional in some of its features, and that he intended to veto it. His objections were that the restriction of the Constitution concerning forfeitures not extending beyond the life of the offender had been disregarded. To meet this objection, which had been communicated to members of the House of Representatives, where the bill originated, a joint resolution explanatory of the act was passed by the House and sent to the Senate. That body, being informed of the objections of the President, concurred in the joint resolution. It was then sent to the President and was received by him before the expiration of the ten days allowed him for the consideration of the original bill. He returned the bill and resolution together to the House, where they originated, with a message, in which he stated that, considering the act and the resolution, explanatory of the act, as being substantially one, he had approved and signed both. That joint resolution declares that the provisions of the third clause of the fifth section of the act shall be so construed as not to apply to any act or acts done prior to its passage, "nor shall any punishment or proceedings under said act be so construed as to work a forfeiture of the real estate of the offender beyond his natural life."
The terms here used, "forfeiture" of the estate of the "offender," have no application to the confiscation of enemies' property under the law of nations. They are, as justly observed by counsel, strictly and exclusively applicable to punishment *321 for crime. It was to meet the constitutional requirement that the punishment by forfeiture should not extend beyond the life of the offender that the joint resolution was passed. The President said to Congress, the act is penal, and does not conform to the requirement of the Constitution in the extent of punishment which it authorizes, and I cannot, therefore, sign it. Congress accepts his interpretation, and by its joint resolution directs a construction of the act in accordance with his views. And this construction, thus directed, is decisive, as it appears to me, of the character of the act.[*] Indeed it is difficult to conceive of any reason for the limitation of the forfeiture of an estate to the life of the owner, if such forfeiture was intended to apply only to the property of public enemies.
The inquiry, then, arises, whether proceedings in rem for the confiscation of the property of parties charged to be guilty of certain overt acts of treason, can be maintained without their previous conviction for the alleged offences. Such proceeding, according to Mr. Chief Justice Marshall, may be had for the condemnation of enemies' property when authorized by Congress. The proceedings in such cases are merely to authenticate the fact upon which, under the law of nations, the confiscation follows. But here the inquiry is, whether, upon the assumption that a party is guilty of a particular public offence, his property may be seized, and upon proof of his guilt, or its assumption, upon his failure to appear upon publication of citation, condemnation may be decreed. The inquiry is prompted from the supposed analogy of these cases to proceedings in rem for the confiscation of property for offences against the revenue laws, or the laws for the suppression of the slave trade. But in these cases, and in all cases where proceedings in rem are authorized for a disregard of some municipal or public law, the offence constituting the ground of condemnation inheres, as it were, in the thing itself. The thing is the instrument *322 of wrong, and is forfeited by reason of the unlawful use made of it, or the unlawful condition in which it is placed. And generally the thing, thus subject to seizure, itself furnishes the evidence for its own condemnation. Thus, goods found smuggled, not having been subjected to the inspection of the officers of the customs, or paid the duties levied by law, prove of themselves nearly all that is desired to establish the right of the government to demand their confiscation. A ship entering the mouth of a blockaded port furnishes by its position evidence of its intention to break the blockade, and the decree of condemnation follows. A ship captured whilst engaged in the slave-trade furnishes, in the use to which it was subjected, the material fact to be established for its forfeiture. In all these cases the proceeding is against the offending thing. And it is true that in these cases criminal proceedings will also lie against the smuggler, or slave-trader, if arrested, and that the proceedings in rem are wholly independent of, and unaffected by, the criminal proceedings against the person. But in the two cases the proof is entirely different. In the one case, there must be proof that the thing proceeded against was subjected to some unlawful use, or was found in some unlawful condition. In the other case the personal guilt of the party must be established, and when condemnation is founded upon such guilt, it must be preceded by due conviction of the offender, according to the forms prescribed by the Constitution. "Confiscations of property," says Mr. Justice Sprague in the Amy Warwick,[*] "not for any use that has been made of it, which go not against an offending thing, but are inflicted for the personal delinquency of the owner, are punitive, and punishment should be inflicted only upon due conviction of personal guilt."
If we examine the cases found in the reports, where proceedings in rem have been sustained, we shall find the distinction here stated constantly observed. Indeed, were this not so, and proceedings in rem for the confiscation of property *323 could be sustained, without any reference to the uses to which the property is applied, or the condition in which it is found, but whilst, so to speak, it is innocent and passive, and removed at a distance from the owner and the sphere of his action, on the ground of the personal guilt of the owner, all the safeguards provided by the Constitution for the protection of the citizen against punishment, without previous trial and conviction, and after being confronted by the witnesses against him, would be broken down and swept away.
There is no difference in the relation between the owner and his property and the government, when the owner is guilty of treason and when he is guilty of any other public offence. The same reason which would sustain the authority of the government to confiscate the property of a traitor would justify the confiscation of his property when guilty of any other offence. And it would sound strange to modern ears to hear that proceedings in rem to confiscate the property of the burglar, the highwayman, or the murderer were authorized, not as a consequence of their conviction upon regular criminal proceedings, but without such conviction, upon ex parte proof of their guilt, or upon the assumption of their guilt from their failure to appear to a citation, published in the vicinage of the property, or posted upon the doors of the adjoining court-house, and which they may never have seen. It seems to me that the reasoning, which upholds the proceedings in this case, works a complete revolution in our criminal jurisprudence, and establishes the doctrine that proceedings for the punishment of crime against the person of the offender may be disregarded, and proceedings for such punishment be taken against his property alone, or that proceedings may be taken at the same time both against the person and the property, and thus a double punishment for the same offence be inflicted.
For these reasons I am of opinion that the legislation, upon which it is sought to uphold the judgment in this case, is not warranted by the Constitution.
I proceed to consider whether, if that legislation be valid *324 and constitutional, the proceedings in the case are in conformity with its requirements.
The act of Congress requires the seizure of the property, the forfeiture of which is sought, to be made under directions of the President. This seizure is preliminary to the commencement of proceedings for the condemnation of the property. "After the same shall have been seized," says the statute, such proceedings shall be instituted. This preliminary executive seizure is essential to authorize the filing of a libel of information, and in that sense it is essential to give the court jurisdiction to proceed; but it does not of itself vest in the court jurisdiction over the property. The President could discharge the property from the seizure without the permission of the court or invoking its action. The mere fact that the marshal is employed as the agent in making the seizure does not alter the case. He does not then act as an officer of the court under its process. Any other person might be selected by the President as his agent. In cases under the revenue laws the seizure is often made by the collector or some officer other than the marshal, and the same thing might be done here. The preliminary seizure, if the property be movable, only determines the court in which judicial proceedings shall be instituted. To give the court control over the property something more is essential. The property must be brought into the custody of the court, and this can only be done under the process of the court. The very theory upon which all proceedings in rem are sustained is that jurisdiction of the court is acquired by taking the res into its custody. It is the seizure under judicial process, judicial seizure as distinguished from any preliminary seizure in any other way, which gives the jurisdiction, and nothing else ever has been held to confer jurisdiction in this class of cases.
Now in the case before us there was not in my judgment any preliminary seizure of the property made by order of the Executive or through his officers or agents, or any subsequent seizure under judicial process. The proceeding was instituted for the forfeiture of 200 shares of the common *325 stock of the Michigan Southern and Northern Indiana Railroad Company, and 343 shares of the Detroit, Monroe, and Toledo Railroad Company, and the only pretence of seizure consisted in a notice given by the marshal, previous to the suit, to the vice-president of the first company and the president of the second company that he had seized the stock in question. The marshal returned that he made the alleged seizure by giving notice in this way. Neither the president of one company or the vice-president of the other company were in possession of the stock, nor were they the agents of the owner, nor was any possession ever taken of the property by the marshal, unless such notice had the power of transmitting the possession to him. To constitute a valid seizure of property as a basis for a proceeding in rem, the party previously in possession must be dispossessed and unable any longer to exercise dominion over the property, and such dominion must be transferred to the officer making the seizure. No other seizure than this will sustain proceedings in rem, according to the established doctrine in admiralty and revenue cases, unless a different mode of seizure is specially prescribed by statute. No other mode would conserve the principle of notice to the party whose property was to be affected, which is essential to the validity of all judicial proceedings. "It is a principle of natural justice of universal obligation," says Chief Justice Marshall, "that before the rights of an individual be bound by judicial sentence, he shall have notice, either actual or implied, of the proceedings against him. Where these proceedings are against the person notice is served personally or by publication; where they are in rem, notice is served upon the thing itself. This is necessary notice to all those who have any interest in the thing and is reasonable because it is necessary and because it is the part of common prudence for all those who have any interest in it to guard that interest by persons who are in a situation to protect it."[*]
The doctrine that notice to the owner is given by seizure *326 of the thing, rests upon the presumption that the owners of property retain possession of it themselves, or place it in the care and management of persons who will represent them and communicate to them any proceedings taken against their interest in relation to it. In this case this doctrine is entirely disregarded. The notice given to the president of one company and the vice-president of the other might, with equal propriety, have been given to any other strangers to the owner. How the marshal could get possession of a thing which he did not touch nor handle nor control, by giving notice to two individuals in Detroit, themselves having no control or possession of the property, passes my comprehension. Shares or stock in companies can only be seized in virtue of statutory provisions, which prescribe a mode of seizure equivalent to actual taking of possession. No such provisions existed in the law of Michigan, in which State the proceedings were had. The Attorney-General, in his instructions to the district attorney for carrying out the act, directed that stocks should be seized according to the methods prescribed by the State law. As no such methods were prescribed by the law of Michigan, or especially prescribed by the court, the case was one for which no provision was made.
After the libel was filed there was no new attempt to make any other seizure of the property than the one previously made. The process of the court directed the marshal to hold the stock which he had seized, referring, evidently, to the preliminary seizure. The marshal returned that he had seized and held the property, referring, as I understand it, to such preliminary seizure.
But further, the act of Congress declares that the proceedings for the condemnation of the property seized shall conform, as nearly as may be, to proceedings in admiralty or revenue cases. Here the proceedings are against property on land, and they must, therefore, conform, as nearly as possible, to proceedings in revenue cases. Now, the act of 1799 prescribes the proceedings in revenue cases, and provides that after default "the court shall proceed to hear *327 and determine the cause according to law."[*] And, in the case of The United States v. The Schooner Lion,[] Mr. Justice Sprague, whose great learning justly adds weight to his opinions, gave a construction to this clause. A default had been properly entered, and it was contended by the district attorney that condemnation followed of necessity, upon default, without a hearing, but the learned judge, citing the clause mentioned, said: "This makes it imperative that there shall be some hearing before a decree of forfeiture, but to what extent must depend upon the circumstances of the case. The court will at least examine the allegations of the libel to see if they are sufficient in law, and the return of the marshal and such affidavit or affidavits as the district attorney shall submit. Where it appears that the owners have had full notice of the proceedings, and ample opportunity to intervene, and have voluntarily declined to do so, slight additional evidence will be sufficient. Indeed, a wilful omission by the owners to answer and thereby make disclosure as to material facts within their knowledge, might, of itself, satisfy the court that a forfeiture should be decreed. But the court will require the prosecutor to introduce full proof of the allegations in the libel whenever the circumstances shall make it reasonable." It will hardly be pretended that the circumstances in this case did not render it reasonable that such full proof should be had, and yet no such proof was had. The only proof offered was of a doubtful admission of the claimant, and consisted of the ex parte deposition of a single witness to a conversation which he alleged he had had with the claimant in 1863 in Virginia.
But this is not all. The act of Congress of 1862 further provides, in prescribing the proceedings to be taken, that "if" the property seized "shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto, the same shall be condemned." Evidently some finding of the court is here contemplated upon presentation of proofs, and it appears to me, was intended as *328 authority for the subsequent decree, as much so as the verdict of a jury is authority for the subsequent judgment, and that without such finding the decree cannot stand. The record discloses that no such finding was made, and that no decree even was entered, as required by the 29th Admiralty Rule, that the libel be taken pro confesso, so as to justify the assumption that its allegations were true.
As the act is highly penal in its nature, it would seem that, according to well-received rules, it should be strictly construed, and a rigid compliance with its provisions exacted. But the very opposite course in the construction of the act appears to have been adopted by the majority of the court.
I am of opinion that the judgment of the court below should be reversed.
Mr. Justice DAVIS, also dissenting.
I concur in the views taken by the majority of the court in its opinion respecting the constitutionality of the acts of Congress under review, but I dissent from the disposition which is made of the case, believing there are errors in the record, entitling the plaintiff in error to have the judgment of the court below reversed. This is a proceeding in rem, and by the course of procedure in admiralty and revenue cases, to which it is assimilated, is conducted differently from suits at common law, or in equity, where there is actual service of process on the person. But all cases in court, proceed on the idea of notice to the party whose property is to be affected. This is a fundamental principle, underlying the whole structure of judicial proceedings, regardless of the form they may assume in the particular court in which they may be instituted. In courts of admiralty, and for hearing revenue cases, seizure of the thing is regarded as equivalent to personal service, on the ground that the person whose property is seized, has intrusted it to the care of some one who has the power and whose duty it is to represent him and assert his claim.[*]
*329 It can be readily seen that in case tangible property which is capable of actual possession is seized, the interests of the owner will be protected by the person in whose custody it is placed. But it is different with intangible property, such as stocks in corporations, which, in their very nature, are incapable of seizure as other property. This species of property does not require to be left in charge of any person for its security and preservation, and it is evidenced by certificates which are, presumptively, in the possession of the owner of the stock, wherever he may be. How, then, can it be said that the mere service of notice on the officers of the corporations in which these stocks were held, either gave notice to the owner of the property, or brought the res within the control of the court? In no sense had they the control of the property, or were they the agents of the owner, or bound to appear and defend his interests. There certainly did not exist between them the legal relation, which raises the presumption in other cases, that the custodian of the property seized, will appear and defend the owner's interests. In point of fact, it may happen that the officers of the corporation are in direct hostility to the interests of the stockholders, and in this particular case it is fairly to be inferred, that the possible thing did actually occur. It is, therefore, very clear that the manner in which these stocks purport to have been seized, did not satisfy the requisites of a revenue seizure, nor convey any notice to Miller, or to any one, sustaining a fiduciary relation to him, of what was done. Nor was his condition improved by the publication of notice, because he lived in an insurgent State, and any attempt to communicate to him the contents of the publication was forbidden, and would, therefore, have been illegal.
But, it may be asked, is there no way in which this species of property can be made the subject of legal process?
The answer is, that it can only be done by statute, which shall point out the mode of proceeding. In such a case the principle of notice is preserved, for the owner is advised that his property can be condemned, and the manner of its condemnation, and naturally, in this condition of things, if it *330 were possible, he would delegate to some one the authority to look after his interests. But stocks cannot be seized, in the absence of any statutory provision on the subject, and the law has failed to make such provision. It is a casus omissus, undoubtedly, but it is not the province of this court to supply the omission. This difficulty was felt by the Attorney-General, because, in his instructions to the district attorneys, he directs that stocks shall be seized according to the methods prescribed by the State laws.
But in Michigan, there is no law which authorizes the taking of stocks on mesne process, and I cannot see how the fact, that they may be taken on final process in that State, tends to support the argument that the method pursued in this case to seize the property in the first instance was proper and legal.
But apart from this view of the subject, which, in my opinion, is fatal to the recovery in this case, there is an irregularity in the proceedings, which should reverse the judgment and send the case back for a new hearing.
There are two acts of Congress relating to the condemnation of enemies' property  one was passed in 1861, and the other in 1862. They differ materially in regard to the grounds on which condemnation can be placed. Besides, the act of 1861 divides the proceeds with the informer, which is not the case under the act of 1862. The libel sets forth every ground of condemnation under both acts, while the decree, in condemning the property, does not find any fact by reason of which it could be forfeited to the United States at all. This, in itself, is sufficient to reverse the decree. But as the decree divides the proceeds with the informer, the court must necessarily have found the property confiscable under the act of 1861, and yet if the evidence in the case, consisting of an affidavit, made in New York, of one Thatcher (who, in some way not disclosed in the record, was able to get down to Virginia in 1863, hunt up Miller, and have a private conversation with him), tends to prove anything, it is that the property was confiscable under the act of 1862. As this is a direct proceeding *331 to reverse the judgment, these irregularities are grounds of error.
For these reasons, in my opinion, the decree in this case should be reversed.
NOTES
[*] Supra, 258.
[*] Scott v. Scholey, 8 East, 474.
[*] 10 Wheaton, 492-3.
[] By Hall, tit. 32, p. 70.
[*] Vide, also, Conklin's Admiralty Practice, 478; Smith v. Miln, Abbott's Admiralty, 373; and our Admiralty Rules, 2 and 37.
[*] Broome's Legal Maxims, 428.
[*] 14 Peters, 458.
[] 2 Howard, 339.
[*] 7 Howard, 181.
[] 2d edition, § 452.
[*] § 454.
[] 1 Sprague, 399.
[*] Vol. i, chap. 1, Information in rem.
[] Page 149.
[] Parker's Reports of Revenue Cases, 57.
[*] 6 Wallace, 759.
[] Ib. 766.
[*] The Venus, 8 Cranch, 253.
[] Prize Cases, 2 Black, 635.
[] § 296.
[*] 2 Sprague, 123.
[] 2 Black, 673.
[] Rose v. Himely, 4 Cranch, 272; Cherriot v. Foussat, 3 Binney, 252; Dobree v. Napier, 3 Scott, 225; Santissima Trinidad, 7 Wheaton, 306; United States v. Palmer, 3 Wheaton, 635.
[§] 4 Cranch, 272.
[*] 2 Salkeld, 635.
[*] 1 Kent's Commentaries, 1.
[*] Thus it is forbidden by the law of nations to use poisoned weapons, or to poison wells, springs, waters, or any kind of food intended for the enemy. "Any state or general," says Halleck, "who should resort to such means would be regarded as an enemy to the human race, and excluded from civilized society." So also it is forbidden to encourage the assassination of an enemy or his generals or leaders, or to put to death prisoners of war, except in case of absolute necessity, or to make slaves of them or to sell them into slavery; or to take the lives of the aged, disabled, and infirm, or to maltreat their persons. The United States are not freed from these prohibitions because they are not inserted in the Constitution.  (Halleck's International Law, chaps. 16 and 18.)
[] 8 Cranch, 122.
[*] Law of Nations, Lawrence's ed., p. 596.
[] 7 Peters, 86.
[*] See Bigelow v. Forrest, 9 Wallace, 350; and McVeigh v. United States, supra, 258.
[*] 2 Sprague, 150.
[*] The Mary, 9 Cranch, 144.
[*] 1 Stat. at Large, p. 695, § 89.
[] 1 Sprague, 400.
[*] Mankin v. Chandler, 2 Brockenborough, 127; Rose v. Himely, 4 Cranch, 277; The Mary, 9 Id. 144.